Please call the next case. 113-1733, Daniel Schwarko, for the bill of judgment. Counsel, you may proceed. Thank you, Your Honor. May it please the Court, Mr. Egan? Good morning. My name is John Bowman. I represent the appellant, Daniel Schwarko. We're here today to ask this Court to overturn the decision of the Illinois Workers' Compensation Commission as against the manifest weight with regard to three issues. Temporary total disability benefits, permanency, and their failure to award penalties and attorney's fees. Also, we're here to ask the Court to rule as a question of law that the Commission's refusal to answer five questions that I posed to them prior to oral argument pursuant to Section 19E was contrary to law. This case was heard by Arbitrator Kelmanson on November the 14th, 2011. Here, you've got three or four really good issues, and I don't want to burn up your time without you telling us what the facts of the case are. We know what they are. Let me try starting backwards. Could you tell me how, by failing to answer these questions, assuming that they were required to do it, you were in any way prejudiced? The only answer that I would have to that, Mr. Justice Hoffman, is that I think it would have made the Commission look deeper into their determinations with regard to permanency and temporary compensation. Let me say this. One of the questions that you say they didn't answer, they did, in fact, answer. That was, I think, your last question. They answered that question. It's in their decision, and if you want me to give you the page, I will. The fifth and final question that you pose is, does the Commission find the Respondent's refusal to pay TTD benefits after October 31st, 2006, to be unreasonable and vexatious, entitling the petitioner to penalties? On page 10 of their opinion, they said, and I quote, the evidence and testimony finds Respondent's termination of benefits not to be unreasonable or vexatious under the circumstances presented here. So they did answer that question. As to the other four, I tend to agree with you that when you submit questions three days before the oral argument, they're hard-pressed to suggest that, number one, they don't have enough time to answer the question, especially in view of the fact that their decision doesn't come out for a month after. And they've never engrafted a rule saying that when it has to be submitted. So I don't buy their argument there. And second of all, one of their reasons was they said you deprive the Respondent of the ability to object, and the Respondent readily admits in his brief that he did object. So, but I fail to see how their failure to answer any of those other four questions in any way prejudiced you. Well, Your Honor, that is certainly the weakest of the four issues. Okay. So assuming that they did violate the rule, but if you are not prejudiced, it affords no basis for us to grant you any form of relief. So let's get to the real issue in this case. If an individual suffers an injury and the employer supplies them with work within their restrictions, and there is evidence in the record that the employer is willing to continue to comply with those restrictions and offer them work within the restrictions, and the employee retires and draws a pension, is that the tantamount to declining work within one's restriction so that it becomes an exception to interstate scaffolding? What's your argument on that issue? Well, I think there are two factors in that. Number one, the Village of Oak Lawn came to my client, and they offered the early retirement. My client didn't seek it out. Number two, neither side had any idea as to the severity of his elbow injury nor the fact that it would take another four or five years of treatment. Mr. Schwarko definitely retired. He was entitled to retire. It was vested. It was an ERISA-backed retirement. But he didn't retire. He only retired from his job at the Village of Oak Lawn. There was nothing that would preclude him from finding some other work. He was only 53 years old. He could have worked but for the severity of his injury. He couldn't work after that. So my answer is no. Except the only person who says that is Dr. Koh, and that's contradicted by almost every other doctor who put him only on restrictions. It was only Koh that said he couldn't work. It was only Koh that said he was definitely totally and permanently disabled. And by the way, Koh seems to be giving a vocational rehabilitation opinion, not a medical opinion, because nowhere in his testimony did he ever say that if this man worked it would be detrimental to his health. What he did say was he can't work because he can't use his right arm. And we've got doctors who know very well what his condition of his right arm is, but say that he can work restricted employment. But I want to get back to this basic. If the evidence before the commission is that work within his restrictions were available and he voluntarily retires from that employer, is that tantamount to refusing work within your restrictions, meaning that you do not get TTD even though you have not reached MMI? Is that the exception to interstate scaffolding? Your Honor, I would answer that this way. The facts of this case do not support what you're saying. Prior to the surgery of August 21, 2006, Mr. Swarko did work light duty. After the surgery of August 21, 2006, he was off work in September. About September 19th or 20th, his doctor released him to one-armed light-duty work, which the nurse case manager, Kathleen Fitzgerald, very poignantly pointed out on her report of, I think, September 28th, that she contacted Sue Latham of the Village of Oak Lawn. They could not accommodate light-duty restrictions. One problem. There was testimony by his boss that, number one, had he not retired, they would have accommodated his restriction, number one, and number two, they've accommodated restrictions for injured worker, one, for as long as eight years. So now the question becomes, if the commission chooses to believe the testimony, and that was live testimony, of the, I forget what his job title was. Stephen Barrett. Yes, but I forget what his job title was. At any rate, assume for a minute that the commission believes that testimony, that if this man had not retired, we would have accommodated his disability. Is that the exception to interstate scaffolding or isn't it? Well, there's the issue of credibility, Your Honor. You're dancing around the question I'm asking you. I'm asking you just, it's very simple. If an employer is willing to accommodate an employee's disability,  is that the exception to interstate scaffolding, yes or no? Yes. It is an exception. I think it is. Okay. Now we get down to the question of what are the facts of this case. Now, we know they accommodated his restrictions until the operation. Correct. After the operation, they never offered him a job. That is correct. They did announce that they had this early retirement. He took it. He filed for it, and they gave it to him. You've got a nurse's note that says she called and they couldn't accommodate his restriction, and you have the live testimony of his boss that says, wait a minute, if this guy hadn't retired, we would have accommodated those restrictions. We've done it for other employees, one guy for eight years. Now, what have we got? Have we got merely a credibility question, or is there something very important about the fact that they didn't actually offer the work? Well, one fact is that they didn't offer the work. The second fact is that three weeks after Dr. Darugian had released him to one-arm or light-duty work, he rescinded that. It's dated October the 20th. He took him completely off work, and he was completely off work at the time he retired. Nonetheless, the village of Oakmont unilaterally suspended his TTD benefits. On October 31st, he was getting TTD. On November 1st, he was not. He was still off work, and his condition not only did not improve, it deteriorated. Now, let me see something. Well, isn't it that they just didn't fail? It's not just that they failed to offer him light-duty work. They refused light-duty work after the surgery. On one occasion, yes, they did, and shortly after that, he was taken off work completely. Right. And his treatment continued. In fact, he was under physical therapy until February 27th of 2007. That was not working. His doctor referred him to a Dr. Kalamuthu, who ordered an EMG, compared the EMG of March of 2007 with the EMG that was done prior to his first surgery. It showed significant deterioration of the ulnar nerve, and the second surgery was recommended. Let me concede this. Whether or not he's capable of working within his restrictions, that's a question to be resolved by the commission, correct? It's a question of fact, isn't it? Yes, it is. All right. So if you have three doctors on the other side of the question, and you have your Dr. Cole, so how is that against the manifest weight on that issue? Well, it's all that is most of the decision with regard to TTD says that a person who is disabled should be entitled to TTD benefits until his condition stabilizes. Dr. Conowitz, who was basically their hand-picked doctor, Dr. Conowitz said his condition did not stabilize until March 31st of 2010, which is the period that the arbitrator awarded temporary compensation benefits in the first place. Now, hold on. I want to correct something you said. I want to make sure we understand the facts of this case. This man was under one-arm restriction until August the 21st, 2006, when he was operated on. And immediately after he was operated on, he was taken off work. That is correct. Correct. Now, he continues under the care of Darogan post-operatively. He sees the doctor on September the 19th, and the doctor releases him to work on September the 20th, 2006, with a one-handed restriction. Am I right so far? You're right, sir. Okay. The village offers him his retirement package on October the 3rd. He accepts the retirement package, and he goes on retirement on October the 31st. Are you telling me that there's some doctor's note somewhere between September the 20th and October the 31st that takes him off work completely? Yes, Your Honor. When was it? It was dated October the 6th. It's, I think, page 1080. It's from Dr. Darogan, Southwest Center for Healthy Joints. It was dated, the first one was dated on the 20th. The second one was taking him completely off work, was dated October. My records tell me that Darogan, immediately after his retirement, continued to prescribe physical therapy and continued to restrict him to one-handed work duties. He did. On October 20th, 2006, Your Honor, Dr. Darogan stated patient is unable to return to work until after next office visit of December 1st, 2006. So December 1st, 2006, is that when he put him on one-handed work restrictions again? No, he never put him on one-handed restrictions. Yes, he did. After December 1st? March the 1st, 2007, Darogan restricted the claimant from performing any work with his right arm. That was his December 1st, 2007 note. After he retired, he went and saw Darogan, and Darogan was giving him physical therapy, and he continued to restrict him to one-handed work duties. I'm going to check the dates of those restrictions, by the way. But the fact of the matter is, this guy was never, ever, other than for short periods of time, totally taken off work. So my question is, you've got a nurse's note that says, they told me that he couldn't, they wouldn't accommodate him. Nobody from the village was called as a witness to testify to that, neither was she. She produced some notes, and that's in a note. But this employee from the village testifies that if he hadn't retired, we would have accommodated him. And we've been doing that. Now, is the commission entitled to believe that? Obviously, they did, yes. And if they believe that, is that the exception to interstate scaffolding? And that's my, that's the difficulty I have with this case. Because, number one, we've got to come to an understanding of what the exceptions to interstate scaffolding are or not. Now, you know, interstate scaffolding, if you take it to its logical conclusion, as long as the guy doesn't refuse work within his restrictions, I mean, he could threaten the life of his employer and get fired for that, but he's going to be able to draw a TTD when he doesn't, because he hasn't reached MMI yet. But be that as it may, is this the equivalent of refusing work within your restrictions if they believe the testimony of his supervisor? Well, Your Honor, that came after the fact. You have to look back to the period of time before he accepted retirement where his doctor had him completely off work. The other thing that has to be taken into consideration is who knew? Who knew what his condition was going to be six months, a year, two years, four years down the road? And how can you unretire? The village put this to him. He accepted it. There was mutual misunderstanding as to what was going to happen in the future. Now, by the way, you tell me that the restriction, no work, was October the 6th. Yes, sir. He accepted the retirement package on October the 3rd when he was still under nothing more than a one-handed restriction by Dr. Derugian. The paperwork was ongoing. The retirement did not take effect until October the 3rd. Well, no, he didn't actually retire until October the 3rd, but he accepted the retirement on October the 3rd before he was ever fired from work completely. He did it. He was authorized to go back to work, one-handed work, on September the 20th. And he accepted their package, their early retirement package, on October the 3rd. I want to check the other dates as to when Derugian terminated this off work that you say on October the 6th. But there's a conflict between what the nurse case manager said that the village would not accommodate and what their witness, a well-coached witness, a company man said. But that was for the commission to decide. That's not for us to decide. Your time is up. You will have time on the floor. Thank you. Is it tantamount to refusing work? What's your name, first of all? May it please the Court. Sorry. Counsel James Egan on behalf of the Village of Oak Lawn. Judge, I believe it is, to be honest with you, and that is part of my argument today, is that, number one, they didn't just go to Mr. This was offered to everyone in the village. And it actually wasn't offered on October 3rd. October 3rd was when he actually accepted it and signed off on the paperwork. So they didn't hand it to him on the 2nd and say, you've got 24 hours to decide. He had time to contemplate this. And they didn't single him out because of a pending cap claim. That's correct. They offered this to everyone in the village. But as far as this employer goes, if you're going to accept an early retirement package and actually go to the effort of purchasing five years of benefits to make sure you're eligible for that, he's actively pursuing that package, and he's telling this employer, I don't want to work for you anymore. Now, maybe he had other plans. I can't testify to that. Well, yeah, but here's the one problem we have, factually, in this case, is that from the time of this man's operation on August the 21st, 2006, until the day he actually retired on October the 31st, 2006, you never actually offered him a job. We did not. The only thing you testified to, the evidence in this record does, in the commission's entitlement to accept it, is that had he not retired, you would have accommodated his work or his injury. So the big question is, is that the exception to the interstate scaffold? Mr. Ciararco also testified that he was aware that they had accommodated restrictions as well. Well, he knew that, and they had an employee. I believe this is an exception to interstate scaffold and to the spigel place for that reasoning. As far as this employer is concerned, he's telling them, give me the package, here's all the money of the time I've saved, I want to move on. Well, getting it down to simple terms, isn't the purpose of the act to compensate an employee for lost earnings resulting from his work injuries? Correct? Yes, it is. So logically, if the employee has lost earnings as a result of his volitional act of removing himself from the workforce, it's not his injuries that have caused, he's losing earnings because he's voluntarily left. It doesn't further the purpose of the campaign at all, does it? I mean, why would it be an exception? I believe it is an, yes, I believe it is an exception to interstate. And looking at the Smigel case as well, the court had indicated that in that situation they should have taken an account and adjusted the amount of money he would have received, Mr. Smigel, above and beyond his Social Security. In this case, he was actually taking more money in than he would have taken from TTD. So as far as Smigel is concerned, there would have been no adjustment to make. I'm not telling him he couldn't go out and try to find some other work. And as far as this case goes, we had work, they made the offer, there was really no need to offer to offer one-handed work at the time, as of October 3rd or a week before. Well, you just said a week before, but what about the nurse's note that pretty clearly says that she called the village and they said light duty cannot be accommodated at this time? At this time. All right. And they never offered any up until the time he retired. They did not. Then the village comes back after the fact and says, oh, we would have accommodated him, which anybody can always look back and say, well, we would have done this. And the commission not only uses that to deny TTD, but also in the face of unrebutted voc rehab testimony on permanent total, says he's not permanent total because the village would have given him work. And those were questions of fact for the commission to decide, and I believe there was ample evidence in front of them to decide as they decided. Well, in any case where an employer has refused to accommodate and give light duty, couldn't they always put somebody on the stand later and say, oh, well, we would have? And the petitioner could also, the plaintiff could also step up and say, after the fact, I can't work at all, so I should get both benefits, my retirement and the TTD, and collect benefits ad nauseum. The vocational report we're referring to was based on one doctor's record, and that was Dr. Coe. Dr. Coe wrote a report, as Justice Hoffman pointed out, that read very much like a vocational assessment form. Of course, Mr. Pagella was going to come up with a report that indicated the gentleman couldn't work at all. He was only operating with one record. Well, the other thing about Pagella is Pagella performed no job search whatsoever, neither did the petitioner. The petitioner quite candidly testified he never looked for work in that entire period of time. And he also moved two hours away. Well, he can move where he wants to move. The question is, in order to be entitled to TTD, he not only has to prove he didn't work, but he has to prove he couldn't work. And in this particular case, all the medical, with the exception of Coe, suggests he could work. He could work at a restricted position. Now, interestingly enough, there's evidence in this record this man was operating on again. But unfortunately, nobody gave us the records of those doctors, so we don't know if any of those doctors ever restricted this man from work after those operations. We do have records pre-later operations. And most of those records, at the very beginning when he was close to working, talk about his ability to work. After he was no longer working, I suppose there was no reason for these doctors ever to even comment on it, because he wasn't working. Coe, we've had a little trouble with Coe's opinions before, and we've kind of stepped on him a little bit when he enters the vocational rehabilitation realm out of the medical realm. But you didn't introduce any voc rehab testimony contrary to Pagela. We did not, sir. Why? I don't have an answer to that. I will rest on the company's decision. We did not do so at the time. But again, I believe Mr. Pagela's report is flawed, and I believe the commission saw that. They took in all the testimony. They looked at all the records that they have. I think it was well within the manifest weight of the evidence for them to rule as they ruled. And it's not as if the arbitrator and the commission gave this gentleman nothing. They gave him 80 percent of the arm. And that's a significant award. I'm not going to belabor the point about the five questions. I believe you've handled that for me, and I'll rest. All right. Thank you, counsel. Counsel, you may reply. Just a couple things. As Mr. Justice Hoffman indicated, the petitioner did undergo a second surgery in May 2007. No TTD was paid for that date of surgery, the following day or the following weeks. No doubt about that. But where is the evidence in the record that anyone said he couldn't work and for how long? That's the problem. There's no medical records for that post-surgery treatment in the record. There's none. Don't you have to prove? I mean, you've got to prove the period of time. On the second surgery, I mean, it defies logic to suggest that he wasn't off of work after the second surgery or apart from working for a period of time. But the question is, what is the period of time? Well, the respondent had Mr. Schwarko examined yet another IME on September the 18th, 2008, after he'd started with pain management treatment, Dr. Peter Hefner of Hinsdale Orthopedics. Dr. Hefner, his report I know is in the record. Hefner opined that he was able to do light sedentary work with his right arm. Correct. Correct. And Dr. Konowitz, the doctor who probably treated him more than anyone after the surgeries, indicated that he could work, but it was basically limited to very light one-handed work, as did Dr. Vendor. But Dr. Tulipon is the one that treated him post-operatively, and none of Dr. Tulipon's records are in evidence. I didn't realize that, Your Honor, and that surprised me. I am not aware of that. But looking at the cases regarding odd lot, it's not enough to say someone can do some work. There has to be work that that individual can do. This individual couldn't drive a car. When he drove his grandchildren around the small town of Henry, he didn't have the strength in his right hand to start the ignition. He had to reach underneath the steering column and start it with his left hand. He could not drive on the expressways. 300-mile round trip from his home in Henry to Dr. Konowitz, his wife had to drive each and every time. That's what Edward Pagela's vocational rehabilitation report. There was nothing that this man could do that would justify payment of wages to him. It's not enough to say there's no work. The respondent did not meet their burden to show that there was work available for him to do. Their supervisor testified if he had not retired, they would have accommodated his condition. Your Honor, who knew? That was his testimony. Who knew five weeks after this first elbow surgery? Wait a minute. When did this man testify? This man testified at arbitration. He didn't testify five weeks after his first surgery. I'm talking about who knew when Schwerko accepted this retirement package, he testified that he expected that he would be fine and he would be able to resume and find other work, and he testified that he wanted to go to New York. The issue is you've got the employer saying if he had not retired, we would have accommodated, and you've got Pagela saying there was no job available for him, and it seems to me that that's a contradictory position. Cole, on the other hand, testifies he's not gainfully employed because he can't use his right arm, and then on cross-examination admits the guy could use his left arm. In fact, he says the reason why he says the guy is incapable of gainful employment, and I don't know why that's a medical opinion, but at any rate, he says, quote, he really can't use his right arm for anything. And then on cross-examination, he admits that he might be able to perform left-handed work. Hopfner, Fender were both of the opinion that he's able to perform right-handed work, and Fender said, no, he worked with his right arm. So I suppose, you know, my real question here is when you look at Pagela's opinion, no gainful employment available, and you look at the employer's witness that says if he hadn't retired, he could have worked for us, does that leave it up, then, to the commission as to whether he was capable of gainful employment? Well, it definitely is a question of fact, Your Honor, but I think the fact that the petitioner made a showing, a primary facing showing that he fit in the odd lot total permit. He was, at the time he testified, 58 years of old. He was a high school graduate. He had 34 years of work with the village. He had no transferable skills, was not computer illiterate, could not drive a vehicle. I assume you're correct. Then what was the burden for the village to do? To come back and show by vocational rehabilitation. No, no, no. No. All they have to do is come back and show that there was a job available for him, and their witness said, we had a job for him. They were the one that offered the early retirement. That doesn't make any difference who offered it. They offered it to every employee. So, I mean, it's a fascinating, interesting case. Thank you, counsel. Thank you. Your time is up. Thank you, counsel, both, for your arguments in this matter. It will be taken under advisement, written disposition.